CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
October 30, 2025
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DUSTIN H.,[1] | ) |
| Plaintiff | ) |
| | ) |
| v. | )  Civil Action No. 7:24-CV-703 |
| | ) |
| FRANK BISIGNANO, | )  By: Hon. Michael F. Urbanski |
| Commissioner of Social Security,[2] | )  Senior United States District Judge |
| | ) |
| Defendant | ) |

## MEMORANDUM OPINION

Plaintiff Dustin H. ("Dustin") filed this action challenging the final decision of the Commissioner of Social Security denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 423 and 1381a. In support of his application, Dustin argues that the determination of the administrative law judge ("ALJ") that he is not disabled is not supported by substantial evidence. Pl.'s Br., ECF No. 11. The Commissioner filed a response to which Dustin has replied. Comm'r's Br., ECF No. 15; Pl.'s Reply, ECF No. 16.

As discussed more fully below, the court finds that substantial evidence does not support the ALJ's determination that Dustin is not disabled. Accordingly, the Commissioner's determination that Dustin is not disabled is **VACATED** and this matter is **REMANDED** to

---

[1] Due to privacy concerns, the court adopts the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. In accordance with Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), he is substituted as defendant.

the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further development in accordance with this opinion.

## I. Judicial Review of Social Security Determinations

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), and Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). The court will uphold a Social Security disability determination if "'(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings.'" Oakes v. Kijakazi, 70 F.4th 207, 212 (4th Cir. 2023) (quoting Arakas v. Comm'r Soc. Sec. Admin., 983 F.3d 83, 94 (4th Cir. 2020)).

A court may neither undertake de novo review of the Commissioner's decision, reweigh conflicting evidence, nor substitute its judgment for that of the ALJ. Id. Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S.

2

197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

Nevertheless, the court does not "'reflexively rubber-stamp an ALJ's findings.'" Oakes, 70 F.4th at 212 (quoting Arakas, 983 F.3d at 95). Remand is appropriate when the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." See Mascio v. Colvin, 780 F.3d 632, 636–37 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"). See also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## II. Claim History

Dustin was born in 1984 and completed the tenth grade. R. 205, 210. He has past relevant work as a crew member at a fast-food restaurant. R. 210–11, 215. Dustin filed his current application for benefits on March 15, 2022, alleging an onset date of April 2, 2021. He alleges disability based on a herniated disc in his back and asthma. R. 178, 209. His reported symptoms include limitations in his ability to lift heavy objects, bend excessively, stand or walk for long periods of time, or sit in the same position for long periods of time. R. 223. He has back pain that radiates down his left leg when he stands for ten minutes, and it feels like his leg will give out. R. 238.

When the ALJ issued his determination following the administrative hearing, he applied the five-step evaluation process described in the regulations. R. 19–31.[3] The ALJ first found that regarding Dustin's DIB claim, he met the insured status requirements through June 30, 2025. He had not engaged in substantial gainful activity since his alleged onset date of April 2, 2021. R. 21. The ALJ found that Dustin had severe impairments of lumbar degenerative disc disease/spondylosis, obesity, asthma/chronic bronchitis, hypertension, diverticulosis, sleep apnea, and diabetes mellitus. R. 22. The ALJ found Dustin's seizure impairment, bipolar disorder, and major depressive disorder to be non-severe under the regulations. R. 22–23. The ALJ found that Dustin's severe impairments, either singly or in combination, did not meet or equal a listed impairment. R. 23–24.

The ALJ found that Dustin had the residual functional capacity ("RFC") to do sedentary work with the additional limitation of needing a sit/stand option every sixty minutes, allowing for a two-to-three-minute change of position at his workstation. The ALJ further found that Dustin could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch, or crawl; should avoid concentrated

---

[3] The ALJ makes a series of determinations: (1) Whether the claimant is engaged in substantial gainful activity; (2) Whether the claimant has a medically determinable impairment that is "severe" under the regulations; (3) Whether the severe impairment or combination of impairments meets or medically equals the criteria of a listed impairment; (4) Whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) Whether the claimant is able to do any other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a) and 416.920(a). If the ALJ finds that the claimant has been engaged in substantial gainful activity at Step 1 or finds that the impairments are not severe at Step 2, the process ends with a finding of "not disabled." Mascio v. Colvin, 780 F.3d 632, 634-35 (4th Cir. 2015). At Step 3, if the ALJ finds that the claimant's impairments meet or equal a listed impairment, the claimant will be found disabled. Id. at 635. If the analysis proceeds to Step 4 and the ALJ determines the claimant's RFC will allow him to return to his past relevant work, the claimant will be found "not disabled." If the claimant cannot return to his past relevant work, the ALJ then determines, often based on testimony from a vocational expert, whether other work exists for the claimant in the national economy. Id. The claimant bears the burden of proof on the first four steps and the burden shifts to the Commissioner on the fifth step. Monroe v. Colvin, 826 F.3d 176, 178–79 (4th Cir. 2016).

exposure to cold, vibration, pulmonary irritants, and chemicals; and should avoid hazards such as moving machinery or heights. R. 24. Based on the testimony from a vocational expert (VE), the ALJ found that Dustin could not return to his past relevant work as a fast-food worker or kitchen helper. However, he could do other work in the economy, such as that of a dowel inspector, lens inserter, or circuit board inspector, and thus was not disabled. R. 29–30. Dustin sought review from the Appeal's Council, which denied review on August 23, 2024. R. 1–3. This lawsuit followed.

### III. Evidence

### A. Medical Records

The medical records summarized below address Dustin's back impairment. Other medical records address his asthma, diverticulitis, high blood pressure, obesity, and diabetes mellitus. Because Dustin's brief focuses on the effects of his back impairment in the context of the ALJ's assessment of his RFC, the court does not summarize the records related to his other impairments, although all the records were reviewed and considered.

On March 24, 2021, Dustin went to the emergency room complaining of sudden onset left lumbar back pain with occasional pain shooting down into his left gluteal area and down the top part of his left leg. He noticed the pain when he lifted a large bag of flour at work. R. 275. He was diagnosed with a lumbar muscle strain and there was no evidence of spinal cord compression. He was prescribed an anti-inflammatory and told to follow up with his primary care physician. R. 278.

On April 2, 2021, Dustin reported that he had been experiencing intermittent back pain for five months with recently increased pain radiating to his left leg. Sitting helped relieve the

pain, but Tylenol and heat did not help. R. 425. Dustin was provided a work/school excuse by Nurse Practitioner Nicole Kemp who said he could return to work on April 13, 2021, but was limited to lifting 15 pounds. R. 831–32. An April 9, 2021, X-ray showed moderate L5-S1 disc space narrowing. R. 480. On April 10, 2021, Dustin saw Mark Coggins, M.D., an orthopedic surgeon, and described aching and burning pain in his left lumbar area that radiated to his left leg with associated numbness and tingling but no weakness. R. 420–21. Examination showed sensory and motor function were intact but his deep tendon reflexes were abnormal and his Achilles reflexes were absent bilaterally. A straight leg test was negative. Dustin walked with an antalgic limp on the left side. Dr. Coggins noted left paraspinous tenderness from L2 through L5 and left posterior superior iliac spine tenderness. Active flexion was restricted to 60 degrees causing left low back pain. R. 423. Dustin was prescribed a course of physical therapy as well as Neurontin, Prednisone, and Voltaren. R. 414.

On May 3, 2021, Dustin saw Jonathan Stewart, M.D., his primary care physician, and reported back pain with left sciatica that was worse with movement. He would get shooting pains down his leg with some relief from propping up his leg. He had no weakness or numbness. Dustin appeared distressed and was leaning to the right in his chair. His diagnosis was left lumbar radiculopathy, moderate persistent asthma with acute exacerbation, and lumbar degenerative disc disease. R. 417–18.

At his physical therapy assessment on May 27, 2021, Dustin reported that his back and leg pain were fairly severe and caused him to move slowly and carefully. He could not lift weight off the floor but could lift weight off a table. He could not walk more than a quarter mile, sit for more than an hour, or stand for more than ten minutes. The pain had no significant

6

effect on his social life, aside from limiting his participation in things like sports. Despite the pain, he could manage a trip over two hours. R. 412. On June 16, 2021, it was noted that Dustin was a "no-show" at physical therapy. R. 406.

On June 15, 2021, an MRI of Dustin's lumbar spine showed a right subarticular to foraminal protrusion at L5-S1 that resulted in severe right subarticular recess stenosis displacing the transiting right S1 nerve root; mild mechanical stress related to marrow edema in the right L5 pedicle and transverse process; and multilevel bilateral foraminal stenosis moderate to severe, on the left. R. 479. On June 24, 2021, Dr. Coggins recommended a series of three interlaminar epidural steroid injections at L5-S1 to treat Dustin's pain. He also recommended that Dustin continue taking Celebrex and Neurontin. Dr. Coggins did not advise surgery because Dustin had bilateral symptomology with right-sided nerve compression. R. 405.

Elizabeth Russo-Stringer, M.D., administered an epidural steroid injection to Dustin on July 26, 2021. R. 396-400. On August 24, 2021, he reported "40% pain relief overall." R. 388. He said it took about a week for the pain, numbness, and tingling to start to subside. He then traveled to Florida and noticed an increase in his pain, numbness, and tingling in his left leg and in the first and second digits of his left foot. Prolonged walking and standing made the pain worse and lying down and resting relieved it and helped the numbness and tingling to subside. He also reported that physical therapy increased his pain. He was taking Celebrex and Gabapentin with good relief and Robaxin also was helpful to him. R. 388.

Dustin received a second steroid injection on September 14, 2021. R. 380–84. The next day he reported stabbing and pinching lower right back pain after the injection that was similar

to his pain before the injection. The pain was not radiating down his leg. R. 379. On September 30, 2021, he reported occasional left low back pain and severe debilitating right-sided low-back pain without radiation. He had no numbness or tingling. R. 373–74. On exam he was in mild distress. His lumbar back was tender and he had a decreased range of motion. A straight leg test on the right was negative. R. 376. Dr. Russo-Stringer recommended a single right facet medial branch block to determine if his pain was facetogenic or discogenic. If discogenic, a third steroid injection would be performed. R. 378.

On November 8, 2021, Dr. Russo-Stringer performed a right lumbar medial branch block. R. 359-60. The next day, Dustin reported 90 to 100% pain relief that lasted four hours. R. 359. On December 13, 2021, he underwent another medial branch block. R. 508. On January 21, 2022, Dr. Russo-Stringer performed a lumbar medial branch nerve and dorsal ramus frequency ablation. R. 510-11. On March 2, 2022, Dustin reported left-sided low-back pain with occasional radiation into his buttock/posterior thigh, but no numbness, tingling, or weakness. R. 535. On March 18, 2022, and April 12, 2022, Dr. Russo-Stringer repeated the left lumbar medial branch blocks. R. 588–92; 578–83. On April 29, 2022, she performed a left lumbar 3-4 medial branch nerve and left L5 dorsal ramus radiofrequency ablation for left L4-5, L5-S1 facets. R. 568–73. On June 2, 2022, Dustin reported improved low back pain and cramping in his buttocks/thighs. He was having more left foot numbness in the L5 dermatome of the foot/toes only, not associated with any activity or position, and with no weakness reported. R. 559.

On September 23, 2022, Dustin underwent an EMG study, where electrodiagnostic evidence suggested a lesion to a branch of the distal deep fibular nerve with EMG evidence

of healing. There was no electrodiagnostic evidence of a focal left fibular mononeuropathy, focal left tibial mononeuropathy, or left L2-S2 radiculopathy based on the nerves and muscles tested. The numbness in his foot was not likely due to radiculopathy in his back. R. 553.

On January 4, 2023, Dustin reported that after he received the radiofrequency ablation, he experienced "75% improvement" in his pain for about six months but his pain had since returned. He was experiencing bilateral lumbar pain without radiation, and he was having difficulty walking, standing, and bending. He continued to experience numbness in his left foot in the webspace between his great toe and second toe. R. 614. On exam, he was not in acute distress. His lumbar back was tender and he had a decreased range of motion. The straight let test was negative bilaterally. He had pain with extension and rotation and his pain improved with flexion. He was positive for facet loading bilaterally. His motor function and gait were intact. R. 619–20. Dustin was referred for weight loss surgery in June 2022 because his weight was more likely than not contributing to his lumbar pathology, but he did not schedule an evaluation for the surgery. R. 621.

Dustin underwent another lumbar medial branch nerve and dorsal ramus radiofrequency ablation on January 23, 2023. R. 659–60. On March 15, 2023, he reported that the procedure was beneficial with a decrease in pain in his lumbar spine, but continued left leg pain from his hip to his knee in L5-S1 dermatomes, with no weakness and no new numbness. R. 606. His diagnosis at that time was lumbar radiculopathy, spondylosis of the lumbar region without myelopathy or radiculopathy, lumbar degenerative disc disease, and chronic lumbar radiculopathy. R. 612. On January 30, 2023, Dustin told Dr. Stewart that he still struggled with

radicular pain, particularly on the left side, going down his thigh. He reported "[doing] okay" on Gabapentin, and that Celebrex and Robaxin also helped. R. 720.

A May 18, 2023, MRI of Dustin's spine showed mild interval progression of degenerative changes at L5-S1, including increased contact and posterior displacement of the descending right S1 nerve root at the subarticular recess, moderate to severe left L5-S1 neuroforaminal stenosis, and other mild degenerative changes. R. 604–05. At a visit with Dr. Russo-Stringer on June 13, 2023, Dustin reported that his tongue was numb, but he had no difficulty with speech and denied facial drooping or numbness. R. 888. Examination showed that he had back pain and myalgias, tingling on the left L-5 dermatome of his thigh, and sensory changes to his left leg and tongue. R. 892.

**B. Hearing Testimony**

At the hearing in front of the ALJ on September 12, 2023, Dustin testified that he was born in 1984 and dropped out of school in the tenth grade. His past relevant work included working in the kitchen at fast-food restaurants. At a pizza restaurant he had to lift 45-pound bags of flour and the last time he tried to do that he was unable to lift and carry that much weight. In addition, he had to sit down to work the mixer. R. 42. He had not worked since 2021. Id.

Dustin described his back pain as aching, burning, and pinching, and it shot down his leg. The pain was worse on the left than the right. The pinching pain was constant, but the burning and aching pain came and went. The pain was worse with bending, lifting, strenuous walking, and sitting for too long. R. 43–44. The only time he felt comfortable was when he was lying down. R. 44. He had been treated with steroid injections, nerve blocks, and nerve

10

ablations, which helped the pain on the right side but not on the left side. R. 44. The injections worked to relieve his pain for a week at most. R. 54.

Dustin thought he could lift and carry fifteen pounds on a fairly consistent basis, although he back would start to hurt after about ten minutes. R. 45. He could walk for twenty to twenty-five minutes at a time and stand for fifteen minutes at a time before his back started to hurt. R. 45–46. He could sit for about twenty minutes before needing to get up and walk around for ten or fifteen minutes to allow the stiffness to abate. R. 46. Dustin lies down four times a day for an hour or two at a time. Id. He takes medication to treat his asthma and uses an inhaler four to six times per day. He lives on the third floor of an apartment building and struggles for breath going up and down the stairs. R. 47.

Dustin has flareups of diverticulitis two or three times per month that cause great pain, with each flareup lasting about a week. R. 47–48. Although there is no mention of seizure activity in the current medical records, Dustin thought he had had a seizure the previous week while he was sleeping, based on his son's description that Dustin was shaking "real bad" in the bed. R. 48.

When Dustin grocery shops, he must use a motorized cart or order groceries online for pickup because he cannot handle walking around the store. When he cooks, he keeps a chair close to the stove so he can sit down and is "up and down pretty much the whole time." R. 49. His wife, children, and mother-in-law do most of the house cleaning. He can pick things up that are not on the floor. R. 49–50. His children do most of the laundry with Dustin supervising. R. 50.

11

He can shower for 15 minutes and then sits on the bed to get dressed. He has four children and takes care of the two youngest, a toddler and an infant. When he is having painful symptoms, either a neighbor or his mother-in-law will help him out, which usually occurs three or four days a week. R. 51–52. He used to enjoy fishing, camping, and going to fairs with his children but can no longer do those activities. R. 52–53.

Dustin is five feet, eight inches tall and weighs 341 pounds. He has tried to lose weight, but exercise is painful and exacerbates his asthma. R. 54. He was taking Gabapentin, Celebrex, and Methocarbamol for pain and muscle spasms, Metformin for diabetes, Montelukast for asthma, Cetirizine for allergies, and Atorvastatin for high blood pressure. R. 54–55. The medications cause him to feel drowsy but he does not experience other side effects. R. 55–56.

The ALJ asked the vocational expert (VE) to consider a person younger than fifty years old, with a limited education and the same work experience as Dustin. The person would be limited to light work, meaning he could lift twenty pounds occasionally, and ten pounds frequently, and could stand or walk for up to six hours and sit for up to six hours in an eight-hour workday. He could only occasionally climb ladders, ropes, or scaffolds, and frequently climb ramps or stairs. He could occasionally stoop or crawl and frequently kneel or crouch. He would need to avoid concentrated exposure to cold and vibration, pulmonary irritants, or chemicals. The VE testified that a person with those limitations could not do Justin's previous work, but could do the work of a marker, which is someone who puts identification information on packages and boxes, a cashier, or a storage facility rental clerk, all of which exist in significant numbers in the national economy. R. 57-58.

12

The ALJ next described a person to the VE who was limited to sedentary work, meaning they could lift ten pounds occasionally, stand or walk for about two hours and sit for about six hours in an eight-hour workday, had the option to stand and readjust for two or three minutes every hour and then sit down to continue working, never climb ropes, ladders, or scaffolds, occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch, or crawl, and would need to avoid concentrated exposure to cold and vibration, pulmonary irritants or chemicals, and hazards like moving machinery or heights. R. 58.

The VE testified that such a person could work as a dowel inspector, lens inserter, or circuit board inspector, with those jobs existing in significant numbers in the economy. R. 58–59. If the sit/stand option were adjusted to standing and walking away from the workstation for ten minutes every thirty minutes, and the person would have three or more absences every month, there would be no light or sedentary work that the person could do. R. 59.

### C. State Agency Determinations

State agency experts who reviewed Dustin's application, both initially and on reconsideration, found he could do light work with additional postural and environmental limitations. R. 62–97.

### IV. Analysis of Dustin's RFC

As set forth above, the ALJ found that Dustin had the RFC to do sedentary work with the additional limitations of needing a sit/stand option every sixty minutes to allow for a two-to-three-minute change of position at his work station; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch,

13

or crawl; should avoid concentrated exposure to cold, vibration, pulmonary irritants, and chemicals; and should avoid hazards such as moving machinery or heights. R. 24.

A claimant's RFC "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184 at *2 (S.S.A. 1996).[4] "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

"The ALJ must consider all of the claimant's "'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019) (quoting Monroe, 826 F.3d at 188). Under SSR 96-8p, an RFC assessment must first identify the claimant's functional limitations or restrictions and assess his work-related abilities on a function-by-function basis, including the function listed in the regulations. Only after such an analysis may an ALJ express the claimant's RFC. Arriving at the RFC before analyzing the claimant's limitations function-

---

[4] Social Security Rulings (SSRs) are interpretations by the Social Security Administration of the Social Security Act. They do not carry the force of law but are binding on the Social Security Administration and ALJs when they are adjudicating Social Security cases. Dowling v. Comm'r of Soc. Sec. Admin., 986 F.3d 377, 387 n.9 (4th Cir. 2021) (internal citations omitted). SSRs are entitled to deference unless they are clearly erroneous or inconsistent with the law. Keller v. Berryhill, 754 F. App'x 193, 196 (4th Cir. 2018) (internal citations omitted).

14

by-function creates the danger that the adjudicator will overlook relevant limitations or restrictions or that the adjudicator will find limitations or restrictions that the claimant does not actually have. Id. However, there is no per se rule that a case must be remanded when an ALJ does not perform an explicit function-by-function analysis. Mascio, 780 F.3d at 636. Rather, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id.

A determination that a claimant can do less than a full range of sedentary work reflects very serious limitations resulting from an individual's impairments and is relatively rare. Policy Interpretation Ruling Titles II and XVI: Determining Capability To Do Other Work—Implications of a Residual Functional Capacity For Less Than a Full Range of Sedentary Work, SSR-96-9P, 1996 WL 374185, at *1 (S.S.A. 1996). "The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50" and "the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions." Id. at *2. "The RFC assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment." Id. at *5 (emphasis added).

If a claimant needs to alternate the required sitting of sedentary work by standing or walking periodically outside scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. Id. at *7.

> The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.

Id.

In Dustin's case, the ALJ found that his back pain could be accommodated in part if he were allowed a sit/stand option every sixty minutes to allow a two-or-three-minute change of position at his workstation. R. 24. The ALJ supported this conclusion by stating that on examination, Dustin had decreased lumbar range of motion, "but not inability [sic] to perform postural actions." R. 28. The ALJ found that Dustin did not report significant issues with sitting or that he had to lie down during the day. Id. The ALJ concluded that "[t]he record indicates that a sedentary exertional level with a sit/stand option every hour and limitations to mostly occasional postural actions accommodate his lumbar degeneration and obesity." Id.

Dustin asserts that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ "crafted a sit/stand option made out of whole cloth." Pl.'s Br., ECF No. 11 at 12. He claims that the ALJ failed to properly explain how he arrived at the sit/stand option that allows for sitting for sixty minutes followed by a two-to-three-minute change of position at the workstation, and that the limitation is not supported by any medical opinion. Id. at 14. The Commissioner counters that that ALJ's RFC is supported by his explanation that "the record indicates that a sedentary exertional level with a sit/stand option every hour and limitations to mostly occasional postural actions accommodate his lumbar degeneration and obesity." Def.'s Br., ECF No.15 at 13.

16

The court first looks at the ALJ's statement that Dustin did not report significant issues with sitting or that he had to lie down during the day. Contrary to the ALJ's statement, at the hearing, Dustin said that sitting "for too long" caused him pain and that the only time he feels comfortable is when he is lying down. R. 44. He lies down about four times per day for one to two hours at a time. He also testified that depending on the chair in which he is sitting, he can sit for only twenty minutes before needing to stand up and walk around for ten to fifteen minutes before he feels comfortable sitting back down. R. 46. Dustin also reported to a physical therapist that sitting in a firm chair was painful, but sitting in a softer chair brought some relief. R. 411. In the function report that Dustin completed for the Social Security Administration, he wrote that his ability to work and to engage in hobbies was limited because he could not sit for a long period of time. R. 223, 227.

To the extent the ALJ was relying on Dustin's subjective description of how long he can sit before needing to move, his statement that Dustin did not report significant issues with sitting or that he had to lie down during the day is not supported by substantial evidence. Dustin has complained several times that "prolonged" sitting causes him pain and the only quantification in the record of what constitutes "prolonged" sitting is that he cannot sit for more than 20 minutes. To be sure, Dustin also testified that he could sit for an hour and could tolerate a two-hour trip, but to say that Dustin did not report significant issues with sitting or that he needed to lie down is not an accurate recitation of the record. While it is the province of the ALJ to weigh the subjective complaints of a claimant to determine their consistency with the record, the ALJ's blanket statement that Dustin did not complain about pain caused by sitting is refuted by the record. Without further explanation of how the ALJ relied on

17

Dustin's statements, his citation to Dustin's testimony is not substantial evidence supporting the two-to-three-minute sit/stand option he assessed.

Of course, a claimant cannot establish that he is disabled solely on a description of his symptoms. When evaluating a claimant's reported symptoms, the ALJ first considers whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's symptoms. Once such an impairment is established, the ALJ evaluates the intensity and persistence of symptoms to determine the extent to which the symptoms limit a claimant's ability to perform work-related activities. Social Security Ruling 16-3P Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *3–4 (S.S.A. 2017). In making the second determination, the ALJ first looks at the objective medical evidence. Id. at *5. If the ALJ cannot make a disability determination that is fully favorable based on objective medical evidence, other evidence, such as statements from the claimant, medical sources, and other sources are considered. Id. at *6.

> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a).

The record in this case contains evidence that both supports and detracts from Dustin's allegations that he cannot sit for more than twenty minutes without being in debilitating pain. Examinations have shown intact sensory and motor function but abnormal deep tendon

reflexes and an absent Achilles reflex bilaterally. Dustin has been observed walking with an antalgic gait at times and having left paraspinous tenderness from L2 through L5 and left posterior superior iliac spine tenderness. He has been noted to appear distressed and leaning left in his chair. At one point he was positive for facet loading bilaterally. The most recent MRI of Dustin's spine showed mild interval progression of degenerative changes at L5-S1, including increased contact and posterior displacement of the descending right S1 nerve root at the subarticular recess, moderate to severe left L5-S1 neuroforaminal stenosis, and other mild degenerative changes.

Conversely, at other times Dustin has been described as not being in acute distress. He has reported to doctors that he could not sit for more than an hour but managed a two-hour trip. He said that the pain had no significant effect on his social life, aside from limiting his participation in things like sports. In addition, straight leg tests have been negative bilaterally.

Although the ALJ summarized the evidence in the record, he did not cite to the evidence underlying his conclusion that allowing Dustin to stand up for two or three minutes every hour would accommodate his pain while sitting, but rather stated only that "the record" supported such a conclusion. This explanation is insufficient. As the Fourth Circuit has pointed out, "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion," with the logical explanation being just as important as the other two factors. Thomas, 916 F.3d at 311. As part of the logical explanation, the ALJ must "build an accurate and logical bridge" between the evidence and his conclusion. Hale v. O'Malley, No. 22-1902, 2023 WL 11907035, at *3 (4th Cir. 2024) (quoting Arakas, 983 F.3d

at 95). "[M]eaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." Thomas, 916 F.3d at 311.

In Dustin's case, the ALJ jumped from describing the medical evidence to concluding that it supported the sit/stand option he described, leaving the court to guess on which evidence he is relying to support his conclusion. See Mascio, 780 F.3d at 636 (finding that a missing analysis is "especially troubling" when the record contains conflicting evidence related to the claimant's RFC that the ALJ did not address). In a case like Dustin's, where he is under 50 years old and is limited to sedentary work, the erosion of the occupational base depends on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time he needs to stand. SSR-96-9P, 1996 WL 374185, at *7. While the RFC assessment in this case is specific as to the frequency of Dustin's need to alternate sitting and standing, the ALJ provided no explanation for how he arrived at the particular sit/stand option. Without doing so, his conclusion is not supported by substantial evidence. Accordingly, the court must **VACATE** the determination of the Commissioner that Dustin is not disabled and **REMAND** his case for further development.

In addition, the court is troubled by another aspect of the proceedings in this case.[5] In the ALJ's second hypothetical question to the VE, the ALJ described a person with the same limitations as in the first hypothetical, but instead of standing for two to three minutes every

---

[5]See Ricks v. Comm'r of Soc. Sec., No. 2:09cv622, 2010 WL 6621693 at *7 and n. 7 (E.D. Va. 2010) (citing Womack v. Astrue, No. CIV-07-167-W, 2008 WL 2486524, at *5 (W.D. Okla. 2008)) (noting that while district courts decide appeals under the Social Security Act by considering the issues raised and argued in a plaintiff's brief, a court has a duty to scrutinize the record as a whole to determine whether the conclusions are reasonable and whether the adjudicator applied the correct legal standards to the evidence, especially in the context of a non-adversarial social security disability case); and Scott v. Barnhart, 332 F.Supp.2d 869, 876 (D. Md. 2004) (raising an issue sua sponte in social security appeal and noting "[a] reviewing court cannot properly discharge its judicial review function without an evaluation and explanation of all material evidence.")

hour, the person would need to stand and move away from the workstation for about ten minutes every thirty minutes. The person also would have three or more absences from the workplace each month. R. 59. The VE testified that a person with these additional limitations would not be able to sustain employment at the light or sedentary level. R. 59.

This hypothetical is confusing, because it is unclear whether a person would be unable to sustain employment if he had either of these limitations, or only if he had both limitations. On remand, the Commissioner should clarify whether a person would be unable to do sedentary work if he needed to be away from his workstation for ten minutes every thirty minutes and also missed three days of work per month, or whether he would be unemployable with this limitation if he missed fewer than three workdays per month.

### V. Conclusion

The court concludes that the ALJ in this case erred when he did not "build the logical bridge" from his recitation of the evidence to his conclusion that Dustin could perform sedentary work with additional limitations, including the limitation that he have a two-to-three-minute sit/stand option every hour. Accordingly, the court **VACATES** the Commissioner's decision that Dustin is not disabled and **REMANDS** this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further development in accordance with this opinion. This matter is **DISMISSED** and **STRICKEN** from the active docket of the court.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: 10/30/2025

Michael F. Urbanski
Senior United States District Judge